## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TINA P. TROTTA, CASEY GUERRA, and BELINDA GUERRA,<br><br>**Plaintiffs,**<br><br>v.<br><br>BOROUGH OF BOGOTA and PATRICK McHALE (in his official capacity as Mayor of the Borough of Bogota); LEONARD NICOLOSI (in his official capacity as Business Administrator of the Borough of Bogota); JOHN DOES 1-10 (names being fictitious),<br><br>**Defendants.** | No. 12–cv–2654 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiffs, Tina P. Trotta, Casey Guerra, and Belinda Guerra, are homeowners and residents of the Borough of Bogota, a town of some 8,000 persons in Bergen County, New Jersey. The rear of the plaintiffs' properties borders Olsen Park, a public park owned by the defendant Borough. Until 2011, an area of trees and vegetation provided a buffer between the plaintiffs' properties and the park. In 2011, the Borough used County grant money to remove the trees and vegetation and build a nine-space parking lot. Plaintiffs, aggrieved by the process and the result, filed this Section 1983 action against the Borough; Patrick McHale, the Borough's mayor; and Leonard Nicolosi, the Borough's business administrator.

The destruction of trees is regrettable, and the plaintiffs feel that the Borough acted underhandedly and shabbily. They are distressed and disappointed to find that the portion of Olsen Park adjacent to their properties is no longer as wooded or as quiet as before. Nevertheless, even a bad decision is not an unconstitutional one. The Borough's decision to build a small parking

lot in a public park did not violate the legal rights of the plaintiffs. In short, this is an issue for the local political process.

Now before the Court is the defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. For the reasons stated below, I will grant the motion.

## I.   BACKGROUND

I here recite the essential chronology. Further facts are referred to in the legal discussion.[1]

----

[1] Citations to the record will be abbreviated as follows:

"Compl." — Complaint (ECF No. 1).

"Def. Ex."— Defendants' Exhibits (ECF Nos. 25–5 to 25–16), attached to the Certification of Christopher C. Botta (ECF No 25–4)

"Pl. Ex." — Plaintiffs' Exhibits (ECF No. 33–4 to 33–25), attached to the Certification of Lawrence P. Cohen (ECF No. 33–3).

"Def Br." — Brief in Support of Defendants' Motion for Summary Judgment (ECF No. 25–1).

"Pl Br." — Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment (ECF No. 33).

"Def Reply" — Defendants' Reply Brief to Pl Br. (ECF No. 35).

"Def Facts" — Defendants' Statement of Material Facts (ECF No. 25–2) I have relied on statements in the Def Facts to the extent that plaintiffs admitted them or did not offer substantive evidence in response.

"Pl Response" — Plaintiffs' Response to Def Facts (ECF No. 33–1).

"Pl Facts" — Plaintiffs' Counterstatement of Material Facts (ECF No. 33–2).

"Def Reply Facts" — Defendants' Response to Pl Response Facts and Pl Facts (ECF No. 35–1).

"Trotta Dep." — Transcript of the Deposition of Tina Trotta (Def Ex. B (ECF No. 25–6)).

"McHale Dep." — Transcript of the Deposition of Patrick McHale (Def Ex. D (ECF No. 25–8)).

"Abbatomarco Dep." — Transcript of the Deposition of Robert Abbatomarco (Def Ex. G (ECF No. 25–11)).

## A. The Properties and the Park

The plaintiffs' houses face the west side of River Road, a north-south artery in the Borough of Bogota. To access their driveways, which are in the rear of their properties, the plaintiffs use Bogert Lane, which runs west from River Road. Perpendicular to Bogert (*i.e.,* running north-south behind the properties and parallel to River Road), there is a gravel-road easement. (Pl Facts ¶¶ 1–3) Beyond that gravel road, on its west side, lies the bulk of Olsen Park. Until 2011, the portion of the park adjacent to the gravel-road easement contained trees and other vegetation that provided a buffer between the park's fields and the plaintiffs' properties. (Pl Facts ¶¶ 4, 7, 88–90) (A diagram of the area is attached to this opinion as an appendix.)

## B. The Project

In 2008, the Borough applied for a grant from the Bergen County Open Space Trust Fund to install a picnic grove and bocce court in Olsen Park, as well as to improve drainage. (Pl Facts ¶¶ 8, 10) In the application, the Borough answered "no" to this question: "Will the project scope include any major disturbance to surrounding area, i.e., felling of trees, clearing of vegetation, etc." (Pl Ex. A at 3 (ECF No. 33–4); Pl Facts ¶ 12) In June 2008 the Borough approved a resolution matching the County grant award. In March 2009 the Borough entered into a contract with the County, which listed as objectives: "Installation of bocc[e] court, bike racks, tables, benches and footpaths." (Def Ex. F at 12 (ECF No. 25–10); Pl Facts ¶¶ 14–17)

Construction did not commence until the latter part of 2011. By then, the project's objectives had shifted somewhat. (Def Reply Facts at 12 ¶ 18) That shift had its genesis in May 2011, when Mayor McHale had the idea to construct a parking lot as part of the project. (Def Reply Facts at 13 ¶ 24; Pl

---

"Nunez Dep." — Transcript of the Deposition of Jorge Nunez (Pl Ex. G (ECF No. 33–10)).

Facts ¶ 24) In July 2011, the Borough Council passed a resolution to authorize the commencement of bidding "for the purpose of drainage improvements at Olsen Park and ditch cleaning." (Def Ex. I (ECF No. 25–13))

The project in its final form was first revealed in August 2011, when a notice requested bids for "Olsen Park drainage and parking improvements," which would include "the removal of large trees, the installation of drainage piping ... construction of a new asphalt parking area and any incidental construction." (Def Ex. J (ECF No. 25–14)) In September 2011, the Borough Council passed a resolution awarding the "Olsen Park Drainage & Parking Improvements Project." (Def Ex. K (ECF No. 25–15)) This resolution was on the "Consent Agenda." Accordingly, it was not formally slated for discussion, but any individual council member could initiate discussion or ask for a separate vote. (Def Facts ¶ 35) Apparently no one did.

Certain facts about the process by which the project evolved to include a parking lot are disputed. Mayor McHale testified that he discussed changing the scope of the project with all the council members. (McHale Dep. 53:14–20) Councilman Nunez denied that he ever had such a discussion with McHale. (Nunez Dep. 54:14–22) Nevertheless, Nunez voted in favor of both the July and September resolutions. (Def Exs. K–J)

McHale testified that safety was one consideration in building the parking lot. Park patrons, including children, were crossing a dangerous street to access the fields, and the area in question had been "full of half dead trees [and] poison ivy." (Def Facts ¶ 21) Another consideration had to do with the playing fields. Mayor McHale had a keen interest in baseball, and had been involved with the Bogota Baseball Organization for twenty years. (Pl Facts ¶ 66) McHale favored the project because it would provide easier access to the baseball fields, and would eliminate vegetation where baseballs were getting lost. (Pl Facts ¶¶ 41, 65) Apparently this was not the only possible site for a parking lot in the park, although according to McHale the alternative location was narrower and less suitable. (Pl Facts ¶¶ 69–70; Def Reply Facts at 18 ¶ 70)

Robert Abbatomarco, the executive director of the Bergen County Open Space Trust Fund, testified that Nicolosi told him of the need for a parking lot on that side of the park. Nicolosi, he said, cited safety concerns based on increased traffic caused by the closure of a nearby bridge. (Def Facts ¶ 38) Abbatomarco replied that "the parking lot would be considered an eligible use of the grant money as part of the park project." (Abbatomarco Dep. 128:9–11; *see* Def Facts ¶ 39)

The construction plan for the parking lot included the removal of fifteen trees. (Pl Facts ¶ 35; Def Facts ¶ 50) McHale testified that he authorized the removal of an additional fifteen trees after the contractor advised him that they were "leaning" and "weren't that stable." (McHale Dep. 66:5–12, 69:13–22, 72:1–14) Those additional fifteen trees were removed without the approval of the Borough Council. (Pl Facts ¶ 42) One of those extra fifteen trees was removed from Borough property behind the home of the plaintiffs' neighbor, Ken O'Donnell, at O'Donnell's request. (Pl Facts ¶¶ 53–56); Def Reply Facts at 16–17)[2]

## C. Aftermath

Plaintiffs say they first learned of the project when construction began. (Pl Facts ¶¶ 57–58) On October 20, 2011, they attended the Bogota Mayor and Council meeting to voice their opposition. (Pl Facts ¶ 62; Def Facts ¶ 53) Trotta testified that at this meeting McHale told plaintiffs, in essence, that the project was a done deal. (Trotta Dep. 43:8–25)[3]

The plaintiffs testified that the removal of the trees as a buffer and construction of a parking lot have increased noise, traffic, and safety concerns on their properties and decreased their privacy and enjoyment of their homes. (Pl Facts ¶¶ 91–107) For example, plaintiffs' sleeping, eating, and TV watching

---

[2] Another neighbor's fence was damaged by the contractor. The contractor repaired it and installed slats in the fence for additional privacy. (Pl Facts ¶ 73)

[3] The Guerra plaintiffs did not speak at this meeting. (Def Facts ¶ 53)

have been disturbed (Pl Facts ¶¶ 93–97) The parking lot's nine spaces are constantly full, and overflow cars block their driveways. (Pl Facts ¶ 100) Trespassers walk across their properties or use their driveways to turn cars around. (Pl Facts ¶¶ 104–05) Individuals sometimes gather in the parking lot to consume alcoholic beverages or play loud music. (Pl Facts ¶¶ 106–07)[4] As a result, plaintiffs allege, the market values of their properties have been reduced. (Pl Facts ¶ 91; *but see* Def Reply Facts at 20 ¶ 91 (citing competing expert reports))

### D.   Claims

Plaintiffs' complaint contains seven claims for relief:

Count 1:  equal protection claim pursuant to the Fifth and Fourteenth Amendments under 42 U.S.C. § 1983 (Compl. ¶¶67–71);

Count 2 (mislabeled Count 3): substantive due process claim pursuant to the Fifth and Fourteenth Amendments under 42 U.S.C. § 1983 (Compl. ¶¶76–78);

Count 3:  procedural due process claim pursuant to the Fifth and Fourteenth Amendments under 42 U.S.C. § 1983 (Compl. ¶¶72–75);

Count 4:  state law nuisance (Compl. ¶¶75–82);

Count 5:  state law inverse condemnation (Compl. ¶¶83–87);

Count 6:  state law diminution of property value (Compl. ¶¶ 88–89);

Count 7:  state law breach of contract (Compl. ¶¶90–93).

Plaintiffs seek damages and attorney's fees for all claims. For the federal and nuisance claims they seek the return of the area to its prior condition. (Compl. ¶¶ 67–93)

---

[4] There is no evidence that plaintiffs have adopted measures (construction of a fence, for example) as a substitute for the screening function once served by the trees and vegetation. At times, plaintiffs seem to imply that the lot is not big enough—*i.e.,* that because it has only nine spaces, people park on their street. (*See* Pl. Br. at 19–20.)

## II.   ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its

favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## B. Federal Section 1983 Claims

Plaintiffs allege three causes of action under Section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

"Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) To state a claim under Section 1983, a plaintiff must allege facts sufficient to show (1) a deprivation of a federal constitutional right or a federal statutory right, and (2) that the conduct at issue occurred "under color of state law." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908 (1981); *accord Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). Accordingly, the Court must first "'identify the exact contours of the underlying right said to have been violated' and [] determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini*, 212 F.3d at 806 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708 (1998)) *accord Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

Plaintiffs allege that the defendants violated their rights to equal protection, substantive due process, and procedural due process.[5] There is no dispute that the Borough acted under color of state law.

**1. Equal Protection (Count 1)**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) (quoting U.S. Const. amend. XIV); *accord Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 133 (3d Cir. 2002). To state an equal protection claim under Section 1983, a plaintiff must allege facts showing the existence of purposeful discrimination. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). The plaintiff must have received different treatment from that received by other individuals similarly situated. *Id.*

A class-based equal protection claim may rest on allegations that a state actor intentionally discriminated because of the plaintiff's membership in a protected class. *Lande v. City of Bethlehem*, 457 F. App'x 188, 192 (3d Cir.

---

[5] To state what has largely gone unsaid, the plaintiffs do *not* allege a claim under the takings clause of the Fifth Amendment. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538, 125 S. Ct. 2074 (2005) (describing the *per se* takings categories of permanent physical invasion and total regulatory takings and the *Penn Central* factors for evaluating other regulatory takings claims). Plaintiffs' alternative constitutional theories are, in many ways, an awkward attempt to circumvent that problematic case law. *See generally Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 721, 130 S. Ct. 2592, 2606 (2010) (plurality opinion of Scalia, J.) (warning against "using Substantive Due Process to do the work of the Takings Clause," an explicit textual source of constitutional protection designed for this situation).

2012) (citing *Chambers*, 587 F.3d at 196). Classically, but not exclusively, such a protected class may be a racial, ethnic or religious minority. No such claim is made here.

Alternatively, however, a plaintiff (like plaintiffs here) may assert a "class of one" theory: *i.e.,* that plaintiff has been intentionally treated differently from other similarly situated persons without a rational basis.[6] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 43 S. Ct. 190 (1923); *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster County*, 488 U.S. 336, 109 S. Ct. 633 (1989)). The Third Circuit has held that, in order to make out such a claim, a plaintiff must establish that: "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). "No rational basis" is a very forgiving standard, from a defendant's point of view; the claim is a difficult one to allege, let alone prove. *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 287 (3d Cir. 2004) (citing *Willowbrook*, 528 U.S. at 565–66 (Breyer, J., concurring)).

Plaintiffs assert a "class of one" equal protection claim, but fail to show that there are genuine issues of material fact as to any of its three elements. True, plaintiffs cite facts from which it could be inferred that a neighbor, unlike plaintiffs, received notice of the parking lot construction ahead of time. (*See* Def Reply Facts at 16–17 ¶¶ 54, 56; Pl Facts ¶ 56) That fact is not material because, as a matter of law, a procedural claim cannot be bootstrapped into an equal protection claim. "[A]s a matter of logic and law a plaintiff may not convert a procedural due process claim into an equal protection claim by expediently alleging that he was denied procedural rights by an official who has

---

[6] "Class of one" should not be taken to signify there can be one and only one plaintiff or injured party. The term is used to differentiate such a claim from a claim of discrimination brought on the basis of the plaintiff's membership in a protected class.

accorded such rights to others in the past." *Stop-Save Twp. Open Places, Inc. v. Bd. of Sup'rs of Montgomery Twp.*, No. CIV. 96–7325, 1996 WL 663875, at *3 (E.D. Pa. Nov. 15, 1996); *accord Highway Materials, Inc. v. Whitemarsh Twp., Montgomery County, Pa.*, No. CIV 02–3212, 2004 WL 2220974, at *23 n.21 (E.D. Pa. Oct. 4, 2004*), aff'd*, 386 F. App'x 251 (3d Cir. 2010); *Cf. Rivkin v. Dover Twp. Rent Leveling Bd.*, 671 A.2d 567, 582 (N.J. 1996) (admonishing against "relabeling procedural due process claims as equal protection claims" in a different context).

There is no other evidence to suggest that the defendants treated plaintiffs disparately from their neighbors or any other similarly situated individuals. Of course, the building of a parking lot most directly affects those whose property is nearby. And anyone may argue that a public facility near his property should not be built at all, or could be built somewhere else.[7] Disparate treatment, however, does not encompass a claim in this unavoidable sense; rather, equal protection requires that the challenged action treat plaintiff distinctly *vis-à-vis some other, similarly situated person,* and that the distinction satisfy the test of rationality. There is no evidence at all that this site was chosen in order to favor the interests of some other similarly situated property owner. The parking lot, which by hypothesis was intended to serve the ball field, was placed near the ball field.

Without sufficient evidence of element 1—a relevant disparity in treatment—the other elements become merely theoretical. In any event, however, they are not met.

As to element 2, there is no evidence that the Borough, McHale, or Nicolosi had the required intent. When considering their actions, they

---

[7] Such a claim, of course, often leaves officials with a conundrum. That somewhere else is usually near someone else. And that someone else, as property owner, will inevitably voice a similar complaint.

seemingly had no intention whatsoever to treat plaintiffs differently from anyone else.[8]

As to element 3, several rational and plausible reasons were given for building the parking lot at this site and cutting down the trees. (Def Facts ¶ 21) One such reason, obviously, is the provision of parking. Plaintiffs themselves acknowledge to their chagrin that the lot is extensively used by park goers, confirming that there was and is a demand for parking in that location. Another stated and plausible justification is safety; visitors were formerly required to cross a busy street to enter the park.

Plaintiffs allege that Mayor McHale's judgment was warped by his and his friends' personal enthusiasm for amateur baseball. (Pl Facts ¶¶ 41, 65–66) A playing field, however, is widely accepted as a permissible public recreational use. By extension, the provision of parking or the clearing of vegetation to provide access to a playing field is rationally viewed as an acceptable public improvement. Such improvements must be sited near the ball fields they serve. To the extent they impact on plaintiffs, the rational basis for that impact is that plaintiffs' properties, too, happen to be situated near the ball fields.

Improving access to the park was not on its face an irrational exercise of the Borough's power, which is properly exercised on behalf of all residents, not just a few. Whether the Borough exercised its power wisely is a question this Court is not equipped to consider. Ultimately, it is one for the voters.

Plaintiffs fail to show that there are genuine issues of material fact as to any of the elements of the "class of one" equal protection claim. Therefore, I will grant defendants' motion for summary judgment as to Count 1.

---

[8] McHale testified that he did not consider the impact the parking lot might have on plaintiffs until they brought it up at the Mayor and Council Meeting on October 20. (McHale Dep. 125:19–127:9) While this may not be a paradigm example of local governance, it is evidence that there was no discriminatory intent directed at plaintiffs. Plaintiffs provide no counter evidence and simply write "denied" in response to defendants' citation in their statement of facts to this part of McHale's deposition transcript. (See Def Facts ¶ 22; Pl. Response ¶ 22; Def Reply Facts at 4 ¶ 22)

## 2. Substantive Due Process (Count 2)

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey*, 523 F.3d at 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392, 400–02 (3d Cir. 2003)).

Real property "ownership is a property interest worthy of substantive due process protection," *DeBlasio v. Zoning Bd. Of Adjustment*, 53 F.3d 592, 600 (3d Cir. 1995), *abrogated on other grounds by United Artists*, 316 F.3d 392, as it "is unquestionably 'a fundamental property interest dating back to the foundation of the American colonies.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 141 (3d Cir. 2000) (internal quotations and citations omitted). To say that real property ownership is the interest at stake here, however, is to paint with too broad a brush. "Although land ownership might initially appear to present a straightforward example of a protected property interest, it is far from clear that every impact on landownership caused by zoning regulations creates a right to process." *Tri-Cty. Concerned Citizens Ass'n v. Carr*, No. CIV. A. 98-CV-4184, 2001 WL 1132227, at *3 (E.D. Pa. Sept. 18, 2001), *aff'd*, 47 F. App'x 149 (3d Cir. 2002) (quoting *MacNamara v. Cnty. Council of Sussex Cnty.*, 738 F. Supp. 134, 141 (D. Del.), *aff'd*, 922 F.2d 832 (3d Cir. 1990)).

There is no contention that plaintiffs have been deprived of any ownership interest in land. Rather, they make the narrower contention that neighboring conditions have impaired the market value of their properties.

The Third Circuit has not yet stated whether substantive due process protection extends to a diminution of property value, as opposed to a deprivation of property. *See Kriss v. Fayette Cnty.*, 827 F. Supp. 2d 477, 493 (W.D. Pa. 2011), *aff'd*, 504 F. App'x 182 (3d Cir. 2012). The Second Circuit, however, has held that "[g]overnmental action allegedly causing a decline in property values has never been held to deprive a person of property within the

13

meaning of the Fourteenth Amendment." *Fusco v. State of Connecticut*, 815 F.2d 201, 206 (2d Cir. 1987) (internal brackets and quotation marks omitted) (quoting *BAM Historic Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983) (a homeless shelter in the neighborhood)). District courts in the Third Circuit have followed suit. *See Kriss*, 827 F. Supp. 2d at 493 (collecting cases); *MacNamara*, 738 F. Supp. at 142 (electric power substation); *see also Bellocchio v. New Jersey Dep't of Envtl. Prot.*, 16 F. Supp. 3d 367, 378 (D.N.J. 2014), *aff'd*, 602 F. App'x 876 (3d Cir. 2015) (noise and air pollution from turnpike and airport); *Smith & Morris Holdings, LLC v. Smith*, No. CIV 14–803, 2014 WL 4660095, at *6 (M.D. Pa. Sept. 17, 2014). I agree, and will do the same.

I conclude that the indirect property right asserted by plaintiffs in this case is not one that is protected by substantive due process. "There is [] no fundamental right in modern society to be free from increased traffic, noise or an incursion on open space. One does not have a protected property interest in the use of neighboring property because that use may adversely affect the value of his property." *Stop-Save*, 1996 WL 663875, at *4 (citing *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990)); *accord Tri-County*, 2001 WL 1132227, at *4.

There is a second problem. Even as to fundamental property rights, only State conduct that "shocks the conscience" violates substantive due process standards. *United Artists*, 316 F.3d at 402. That, too, is lacking here. Overruling prior cases applying a lesser standard, *United Artists* held that an "improper motive" is not sufficient to transform a municipal land-use dispute into a substantive due process claim. *Id.* The "shocks the conscience" standard, generally applicable to substantive due process claims, limits liability to the most egregious conduct and prevents the federal court from becoming a "zoning board of appeals." *Id.* at 401–02; *see Eichenlaub*, 385 F.3d at 286 (holding that allegations that township "maligned and muzzled" plaintiffs, applied standards not applied to similar properties, delayed permits and

approvals, improperly increased tax assessments, and pursued unannounced and unnecessary enforcement actions in denying zoning requests failed to "shock the conscience").

The Third Circuit has provided examples of wrongdoing in the land-use context that might rise to the level of shocking the conscience. These include corruption, self-dealing, and bias against an ethnic group. *See Chainey*, 523 F.3d at 220 (discussing *Eichenlaub, supra*). Nothing in this record approaches that threshold. Adding a parking lot to a public park—even if done for the sake of improving access to a baseball field, and at the behest of a hypothetical baseball-crazed mayor—is hardly conscience-shocking. The Mayor's personal preferences notwithstanding, this remains an action to open up Olsen Park to those who wish to use it for recreation. That is a legitimate public purpose. *See Skiles v. City of Reading*, 449 F. App'x 153, 158 (3d Cir. 2011) (action with legitimate governmental interest belied substantive due process claim). The benefit of the project is public and diffuse; even assuming for purposes of argument that the Mayor's motives were somehow irregular, they were not corrupt. I therefore do not believe this is the sort of "self-dealing" that concerned the Third Circuit in *Chainey* and *Eichenlaub*.[9]

The interest at issue is not one that is protected by substantive due process. Even if it were, there is no showing of conduct that shocks the conscience. I therefore grant the defendants' motion for summary judgment as to Count 2 (mislabeled as Count 3), the substantive due process claim.

### 3. Procedural Due Process (Count 3)

To state a procedural due process claim, a plaintiff must establish "(1) that it was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty and property, and (2) that

---

[9] The plaintiffs also refer to political animus between themselves and the Mayor. The events cited, however, date from after the construction of the parking lot. The animus is an artifact, not a cause, of the parking lot issue.

the procedures available to it did not provide due process of law." *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 62 (3d Cir. 2013) (citing *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011)).

   i.   *Deprivation of property*

   A procedural due process analysis can be triggered by a range of property rights, including those created by state law.[10] *See DeBlasio*, 53 F.3d at 598–99. Where a plaintiff can point to a personal entitlement to some benefit, the plaintiff may have a right to an individualized hearing before he or she can be deprived of it. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701 (1972) (absent tenure or other entitlement, no hearing required before deciding not to rehire professor); *see also, e.g., Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S. Ct. 1011 (1970) (deprivation of statutory entitlement to welfare benefits triggers due process); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1134 (3d Cir. 1992) (deprivation of tenured faculty position triggers due process).

   Real property ownership is obviously a protected property interest, and the Borough may not deprive a person of such property without due process (and just compensation). *See* U.S. Const. amends. XIV, V. The plaintiffs here, however, do not assert a taking claim; they are not being deprived of the use of their properties, or of the properties themselves. (*See* n.5, *supra*.) Rather, the plaintiffs assert a more elusive entitlement to have the market value of their properties remain undiminished by official action. Now a homeowner can plausibly tie virtually any local political issue to the value of his or her property. Almost any condition in a small New Jersey town—traffic, schools, transit schedules—affects property values. But each citizen is not constitutionally entitled to a hearing in advance of every change in traffic patterns, curricula, or bus schedules. In short, lines must be drawn. Case law

_____

[10] In this respect it is broader than substantive due process, where the property interest must be fundamental. *See* Section II.B.2, immediately preceding.

has not extended procedural due process protections to a person's derivative or indirect economic interest in the condition of neighboring (public) properties as they affect the value of that person's own property.

In *BAM Historic Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983), for example, residents brought a procedural due process challenge against New York City for failing to hold a hearing before opening a homeless shelter in their neighborhood. The residents contended that the shelter would cause a decline in their own property values. 723 F.2d 233. The Second Circuit held that government action that causes a decline in property values (short of a Fifth Amendment taking or a near-total destruction of value) "has never been held to 'deprive' a person of property within the meaning of the Fourteenth Amendment." *Id.* at 237.

At least one court in this district has adopted the Second Circuit's reasoning in *BAM. See Twp. of W. Orange v. Whitman*, 8 F. Supp. 2d 408, 416 (D.N.J. 1998) (procedural due process claim against establishment of group homes for the mentally ill). I adopt it as well. The U.S. Constitution does not protect us from fluctuations in the value of our property based on changes, even government-initiated changes, to the neighborhood. It therefore does not confer an individual entitlement to any particular level of process before such changes can occur.

It is only human to *feel* entitled to the status quo, in this case a fortuitous private benefit: a wooded preserve, maintained at public expense, sheltering plaintiffs' property. But "[t]o have a property interest in a benefit, a person ... must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972).

Plaintiffs clearly had a subjective expectation that the configuration of uses in the park adjoining their property would always remain the same. They do not, however, point to any legal basis for elevating that expectation to a protectable property interest. Changes to facilities and parking on public land

17

do not implicate a personal right or entitlement belonging to any plaintiff. It follows that plaintiffs were not entitled to, *e.g.,* an individualized hearing before the Borough could take the action it did.

    *ii.    Procedure*

    Even assuming *arguendo* that some protected interest is involved, plaintiffs cite no authority for the proposition that they are entitled to a pre-deprivation hearing before implementation of a government decision—here, construction of a parking lot on public land—that might affect the value of their real estate. Plaintiffs cite only very general procedural due process precedent, involving personal property, rights, and entitlements, such as *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487 (1985) (civil service employment requiring cause for termination); *Parratt*, 451 U.S. at 536–44, 101 S. Ct. at 1913–17 (hobby kit ordered by prisoner); and *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 307, 70 S. Ct. 652 (1950) (notice to known beneficiaries of trust).

    Plaintiffs have much to say about the creeping process by which the proposal came to include a parking lot. It must be said that the Borough did not exactly solicit citizen input. It did, however, obtain authorization from the County, put the project out for public bid, and enact the necessary resolution *via* the Borough Council's Consent Agenda. Whether or not this fully complied with State law is not the issue as such. State-mandated procedures are not federally required: "Whether notice and hearing procedures should be instituted to broaden public participation in governmental decisions of the sort challenged in this case remains a matter for consideration by state and local legislative bodies." *BAM*, 723 F.2d at 237. State-mandated procedures can, however, satisfy federal standards and thereby defeat a procedural due process claim. *Cf. Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 679–80 (3d Cir.1991).

    Defendants argue in the alternative that adequate post-deprivation hearings or remedies can satisfy due process requirements. In the somewhat

analogous context of zoning, it is an element of plaintiff's claim "that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *DeBlasio*, 53 F.3d at 597.[11]

> [A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body. In other words, when a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process, whether or not the plaintiff avails him or herself of the provided appeal mechanism.

*Id.* (internal quotation marks and citations omitted). In *DeBlasio*, the Third Circuit recognized that New Jersey provides adequate process, in part because, pursuant to N.J. Ct. R. 4:69–1 to –7, a plaintiff can file a complaint "in lieu of prerogative writs" to challenge official action within 45 days of receiving notice of it. 53 F.3d at 598; *see Hartman v. Twp. of Readington*, No. CIV 02–2017, 2006 WL 3485995, at *12 (D.N.J. Nov. 30, 2006) ("the Third Circuit has determined that the availability in New Jersey of prerogative writ litigation is constitutionally sufficient to meet the requirements of procedural due process." (citing *DeBlasio*)); *John E. Long, Inc. v. Borough of Ringwood*, 61 F. Supp. 2d 273, 279 (D.N.J. 1998), *aff'd*, 213 F.3d 628 (3d Cir. 2000) (same); *see also Rivkin*, 671 A.2d at 580–81 (citing N.J. Const. art. VI, § 5, ¶ 4).

Plaintiffs contend that New Jersey's action in lieu of prerogative writs is inadequate because there was no opportunity to file it; it does not enable plaintiffs to recover monetary damages, attorney's fees, and costs; and "because the park cannot be returned to its previous state through that legal action." (Pl Br. 24) It is black letter law, however, that "[a]lthough the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due

---

[11] The overruling of *DeBlasio,* noted above, pertained to the substantive due process shocks-the-conscience standard, a separate issue.

process." *Parratt*, 451 U.S. at 544; *see also Rivkin,* 671 A.2d at 580–82 (action in lieu of prerogative writs not inadequate simply because it does not routinely allow recovery of attorney's fees); *Wessie Corp. v. Sea Isle City Zoning Bd. of Adjustment*, No. CIV 06–589, 2007 WL 1892473, at *7 (D.N.J. June 29, 2007). No legal action (including this one) can return the park to its previous state, but New Jersey's action in lieu of prerogative writs was likely plaintiffs' best chance for prospective injunctive relief, or, failing that, for redress. When plaintiffs fail to take advantage of an adequate process available to them they cannot claim constitutional injury. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008).

Neither requirement of a procedural due process claim is met here. Plaintiffs have not been deprived of property. In the alternative, they have not been denied procedures required by the Constitution or federal law. Summary judgment is therefore granted on Count 3, the procedural due process claim.

### C. State Law Claims

#### 1. Supplemental Jurisdiction

I have granted summary judgment to defendants on all federal law claims. "The district courts may decline to exercise supplemental jurisdiction over a [state law] claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). I therefore consider whether I should exercise my discretion to assert supplemental jurisdiction over the associated state law claims: nuisance, inverse condemnation, diminution of property value, and breach of contract.

As to the limits of discretion to retain state law claims after federal claims have been dismissed, the United States Court of Appeals for the Third Circuit has given the district courts some guidance:

> [W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so.

*Hedges v. Musco,* 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995)). In short, the presumptive rule is that the state claims shall be dismissed, unless reasons of economy and fairness dictate otherwise.

Where a case has been substantially litigated for some time, it may be a proper exercise of discretion to retain it. *See Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1284-85 (3d Cir. 1993) (remanding for exercise of discretion as to whether to retain pendent claim, noting that where the district court already heard all evidence necessary to decide the state contract claim, it might retain jurisdiction). Where, on the other hand, time and effort will not be wasted and the case is nowhere close to trial, remand may be the proper course. *See Freund v. Florio,* 795 F. Supp. 702, 710 (D.N.J. 1992) ("[A]t this early stage in the litigation, dismissal of the pendent state claims in a federal forum will result in neither a waste of judicial resources nor prejudice to the parties.").

This case, filed in 2012, has been substantially litigated. The state law claims are alternative theories applied to the same facts. The parties have conducted significant discovery and it would be unfair and wasteful to require that the action be recommenced in State court. I therefore exercise my discretion to retain jurisdiction over the state claims.

### 2. Nuisance (Count 4)

The plaintiffs assert a state-law tort claim for nuisance. There is a threshold bar to such a claim, in that plaintiffs have not demonstrated compliance with the New Jersey Tort Claims Act ("TCA"). Setting that aside, plaintiffs and defendants argue over whether the parking lot amounts to a public nuisance, a private nuisance, both, or neither. (Def Br. § VI; Pl Br. § VI)

### i.   Compliance with the TCA

In New Jersey, "public entity liability for nuisance is recognized under the Tort Claims Act." *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes,* 449 A.2d 472, 478 (N.J. 1982). "'Public entity' includes the State, and

any ... municipality...." N.J.S.A. § 59:1-3. "Under *N.J.S.A.* 59:8–8 of the Tort Claims Act, the claims will be barred if suit is not filed within two years after accrual, or if notice of claim is not given within ninety days." *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 675 A.2d 1077, 1083 (N.J. 1996).

Plaintiffs have provided no evidence (or even alleged) that they ever complied with the notice requirement of the TCA. Thus, I will grant the defendants' motion for summary judgment and dismiss Count 4, the nuisance claim.

Out of caution, I authorize a motion for reconsideration if, within fourteen days, plaintiffs can provide proof of compliance with the TCA. For the parties' guidance in the event this is done, I briefly state the legal standards that would govern a nuisance claim.

### ii.   *Private nuisance*

"The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land." *Sans v. Ramsey Golf & Country Club, Inc.*, 149 A.2d 599, 605 (N.J. 1959). The Supreme Court of New Jersey has held that the TCA at N.J. Stat. Ann. § 59:4–2 "imposes liability upon a municipality in its status as property owner for nuisance where its actions can be found to be 'palpably unreasonable.'" *Birchwood Lakes*, 449 A.2d at 478. Further, N.J.S.A. 59:2–2 "makes the public entity liable for the acts and omissions of public employees to the same extent and in the same manner as a private individual under like circumstances." *Id.* A private nuisance claim, then, permits a neighboring property owner to sue the municipality *qua* property owner.

These requirements are heightened in the context of the TCA where "[p]laintiff[s] bear[] the burden of proving that [defendants] acted in a palpably unreasonable manner." *Muhammad v. New Jersey Transit*, 821 A.2d 1148, 1154 (N.J. 2003). Palpably unreasonable behavior is that which is "'patently unacceptable under any given circumstance.... [F]or a public entity to have acted or failed to act in a manner that is palpably unreasonable, it must be manifest and obvious that no prudent person would approve of its course of

action or inaction.'" *Ogborne v. Mercer Cemetery Corp.*, 963 A.2d 828, 834 (N.J. 2009) (alterations in original) (quoting *Kolitch v. Lindedahl*, 497 A.2d 183, 187 (N.J. 1985)). "Although the question of palpable unreasonableness is generally one for the jury, it may be decided by the court as a matter of law in appropriate cases." *Garrison v. Twp. of Middletown*, 712 A.2d 1101, 1116 (N.J. 1998) (Stein, J., concurring) (citing *Wooley v. Bd. of Chosen Freeholders Monmouth Cty.*, 526 A.2d 1116, 1119 (N.J. Super. Ct. App. Div. 1987) ("it is a jury question of whether or not the State's actions were 'palpably unreasonable' ... except in cases where reasonable men could not differ." (internal quotation marks and citations omitted))); *accord Maslo v. City of Jersey City*, 787 A.2d 963, 965 (N.J. Super. Ct. App. Div. 2002); *see also Muhammad*, 821 A.2d at 1156–57 (deciding whether action was palpably unreasonable on summary judgment).

One strand of the claim appears to be that the Borough is guilty of nuisance because it failed to maintain the park in its former condition. Another might be more narrowly directed at the Borough's failure to control annoying activities in and around the parking lot. Where, for example, a nuisance claim is based on noise, "a plaintiff must show '(1) injury to the health or comfort of ordinary people to an unreasonable extent, and (2) unreasonableness under all the circumstances, particularly after balancing the needs of the maker to the needs of the listeners.'" *Traetto v. Palazzo*, 91 A.3d 29, 33 (N.J. Super. Ct. App. Div. 2014) (quoting *Malhame v. Borough of Demarest*, 162 248, 261, 392 A.2d 652, 658 (N.J. Super. Ct. Law Div. 1978)).

> With regard to the first element, "[t]he interruption of normal conversation, the drowning out of TV sound, an occasional disturbance during sleeping hours, and like complaints, may all fall within the area of mere annoyance." *Malhame, supra,* 162 *N.J.Super.* at 261, 392 *A.2d* 652. However, occasional noisy disturbances concomitant with residential living can rise to the level of nuisance if, based on proximity, magnitude, frequency, and time of day, they cause some residents "more than mere annoyance, ... temporary physical pain[,] and more than usual anxiety and fright." *Id.* at 263, 392 *A.2d* 652

*Id.* at 33–34 (alterations in original).

### iii. Public nuisance

The Restatement (Second) of Torts defines a public nuisance as "an unreasonable interference with a right common to the general public." § 821B (1979). The New Jersey Supreme Court adopted the Restatement definition and held that "the right with which the actor has interfered must be a public right, in the sense of a right 'common to all members of the general public,' rather than a right merely enjoyed by a number, even a large number, of people." *In re Lead Paint Litig.*, 924 A.2d 484, 497 (N.J. 2007) (quoting Restatement (Second) of Torts § 821B cmt g.) The Restatement (Second) offers the following example:

> [P]ollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance.

Restatement (Second) of Torts § 821B cmt g; *accord In re Lead Paint*, 924 A.2d at 497.

Plaintiffs do not complain of anything approaching an interference common to the general public. The presence of the parking lot interferes with them and possibly a few other neighbors. (*See* Pl Facts ¶ 59) Plaintiffs argue that defendants interfered with "the public's right to the preservation of trees and green spaces in the Borough's parks." (Pl Br. 34) The asserted right to the preservation of every tree or slice of green space would rule out all change or development; indeed, the park itself, or perhaps even plaintiffs' own homes, could not have been built in the first place. Count 4, assuming it is viable under the TCA, does not state a claim for public nuisance.

Summary judgment is granted as to Count 4 for failure to comply with the TCA. Assuming *arguendo* that compliance is demonstrated, I would consider the merits of the private nuisance claim at that time. I would dismiss the public nuisance claim as a matter of law in any event.

### 3. Inverse Condemnation (Count 5)

Defendants correctly argue that plaintiffs cannot succeed on a state-law inverse condemnation claim.[12] Plaintiffs do not defend this count in their opposition brief.

"The concept of inverse condemnation recognizes that the landowner may initiate the action to compel compensation from government; one need not wait in vain for government compensation." *Klumpp v. Borough of Avalon*, 997 A.2d 967, 976 (N.J. 2010).

> In an inverse condemnation action, a landowner is seeking compensation for a *de facto* taking of his or her property. [A] property owner is barred from any claim to a right to inverse condemnation unless deprived of all or substantially all of the beneficial use of the totality of his property as the result of excessive police power regulation. [N]ot every impairment of value establishes a taking. To constitute a compensable taking, the land owner must be deprived of all reasonably beneficial use of the property.

*Greenway*, 750 A.2d at 767 (alterations in original) (internal quotation marks and citations omitted). "Diminution of land value itself does not constitute a taking." *Gardner v. N.J. Pinelands Comm'n*, 593 A.2d 251, 259 (N.J. 1991); *accord Pheasant Bridge Corp. v. Twp. of Warren*, 298, 777 A.2d 334, 344 (N.J. 2001). Further, "incidental inconveniences or annoyances" do not amount to a taking in New Jersey. *Klein v. N.J. Dep't of Transp.*, 624 A.2d 618, 623 (N.J. Super. Ct. App. Div. 1993).

Plaintiffs provide no facts to suggest that they have been deprived all or substantially all of the beneficial use of the totality of their property, as required by inverse condemnation precedent. At most they allege disruptions to their daily life and some impairment of the value and enjoyment of their property. (Pl Facts ¶¶ 91–107) I grant summary judgment as to Count 5, the inverse condemnation claim.

_____

[12] The requirements of the TCA do not apply to an action for inverse condemnation. *Greenway Dev. Co. v. Borough of Paramus*, 750 A.2d 764 (N.J. 2000).

### 4. Diminution of Property Value (Count 6)

"Diminution of property value" is not a recognized cause of action in New Jersey. Plaintiffs do not defend this count in their opposition brief. I grant summary judgment as to Count 6.

### 5. Breach of Contract (Count 7)

Plaintiffs allege that they are third-party beneficiaries of a contract between the Borough and the County, and that the Borough has breached that contract. (Compl. ¶¶ 91–92) Plaintiffs do not defend this count in their opposition brief.

"It is a fundamental premise of contract law that a third party is deemed to be a beneficiary of a contract only if the contracting parties so intended when they entered into their agreement." *Ross v. Lowitz*, 120 A.3d 178, 190-91 (N.J. 2015) (citing *Broadway Maint. Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982)). No facts suggest that the Borough and County intended the plaintiffs to be third-party beneficiaries of their contract. *See id.* (stating upon affirming a grant of summary judgment that "there is no suggestion in the record that the parties... had any intention to make plaintiffs... a third-party beneficiary of their agreements"). The contract itself explicitly mentions third parties only in the wholly unrelated context of subcontractors. (*See* Def. Ex. F at 10 ¶ 22)

The obvious and overriding purpose of the Contract is to improve a park established for the recreational use of the general public. There is no indication that the parties, in entering into this contract, intended to confer upon these plaintiffs any particularized benefit beyond that accruing to the public as a whole. Seeing no express provision for third-party rights, and lacking any facts implying that the contracting parties intended such benefits, I grant summary judgment on Count 7, the breach of contract claim.

### III.   CONCLUSION

Defendants' motion for summary judgment is **GRANTED** as to all counts. An appropriate order accompanies this Opinion.

Dated: June 6, 2016

Hon. Kevin McNulty
United States District Judge

E
N
S
W
Width Road
RIVER (50') ROAD
KRAMER (50') CT
BOGERT (50') LANE
conc. curb
conc. sidewalk
stop sign
street sign
bus stop sign
mh rim27.19
mh rim27.30
mh rim27.30
c.l. fence
macadam pavement
conc walk
House
adj. dwelling
House
adj. dwelling
adj. dwelling
adj. dwelling
macadam drive
m.h. rim21.60
NEW 2' AREA DRAIN GR 10.7 INV 7.4
NEW 2' AREA DRAIN GR 10.5 INV 8.0
cb hd 11.13 6"dip inv 9.47
REMOVE EXISTING CURB
NEW 2' AREA DRAIN GR 10.15 INV 8.00 DIP 6" IN INV 7.5 OUT 12"
NEW 2' AREA DRAIN RIM 9.80 INV 6.55
11 LF 12" ADS N-12 PIPE @ 1.0%
Gravel drive
existing wooded area
New Parking Lot
NEW PAVEMENT
wood stockade fence
inlet gr 9.04 inv 5.94
inlet gr 8.97 inv 5.82
flag pole
30" bench
macadam path
EDGE OF NEW HMA (MATCH EXISTING AT HIGH POINT)
GRANITE BLOCK CURB
foul pole
NEW ADA SIGN
frame shed
bleachers (typ.)
wood covered dugout
home plate
127 LF 12" ADS N-12 PIPE @ 0.75%
67 LF 12" ADS N-12 PIPE @ 0.75%
pitchers mound
wood covered dugout
inlet gr 7.28 inv 5.28
bleachers
walkway
Olsen Park
Zac Field
edge grass
macadam path
playground ahead